## N. Y. SUPERIOR COURT.

WILLIAM F. HAWKINS agt. CLIFFORD PEMBERTON and another.

Where an article sold by an auctioneer was called by him "*blue vitriol*," which was open to inspection," but evidently was so termed as being its commercial designation, or as being a vitriol of a blue color (which it was), in either case there was no *warranty* of anything, even though the auctioneer stated that the article "was sound and in good order," and the article in fact was an *inferior article of blue vitriol*.

The term "sound" applies to *condition* only, not to quality or kind, and is opposed to *defective, decaying* or *injured*. The article sold was evidently sound as *inferior blue vitriol*, and there being no question but what it was in *good order*, there was no deception practiced upon the purchaser, although he alleged that he purchased it under the representations of the auctioneer as merchantable blue vitriol.

*General Term, April,* 1868.

*Before* ROBERTSON, *Ch. J.,* BARBOUR *and* GARVIN, *Justices.*

ON the 16th day of January, 1867, Messrs. Burdett, Jones & Co., a responsible house of auctioneers, sold twenty-five casks of blue vitriol at auction.

The vitriol belonged to the plaintiff, and the auctioneers were employed by the plaintiff to sell it.

Some of the casks were opened from an hour to two hours before the sale, and were examined by the defendants, and appeared to be merchantable blue vitriol. Looking at blue vitriol, you cannot tell whether it is adulterated or not. The auctioneer stated, when he offered it for sale, "*here are twenty-five casks of blue vitriol, sound and in good order.*"

The defendants purchased twenty-three casks, at eight cents per pound, on the faith of the representntions made and the cursory examination they were able to make before the sale.

The defendants, after the sale, took specimens to their own office, and laid them on their sample table. The next morning they found that these samples had turned nearly all white on the surface, and a dirty green shade in the body of the material.

The defendants had specimens analyzed, and found that it contained about twenty-five per cent of blue vitriol and seventy-five per cent of sulphate of iron and sulphate of zinc.

There is no means of detecting this, except by chemical analysis, until the substance has been exposed to the air from ten to twelve hours, when it will effloresce, and the sulphate of iron turn white.

Before such exposure to the air it had all the appearance of merchantable blue vitriol. The twenty-five per cent of vitriol in it was its greatest value.

Sulphate of iron was worth about one and a half cent per pound. Merchantable blue vitriol was worth at that time about eight and a half to nine cents per pound. This cost the plaintiff three and one half cents per pound.

On the 17th, the day after the sale to them, the defendants notified the auctioneers that they declined to take the vitriol, upon the ground that it was not what it was represented to be.

On the 22d the plaintiff caused it to be resold on account

Hawkins agt. Pemberton.

of the defendants, when it sold for about four and half cents per pound.

The second purchaser was cheated, and swears it is not worth anything and has no market value.

The plaintiff then brought this suit to recover the difference between the defendants' bid and the amount it realized on a re-sale.

The defendants answer—

*First.* That the plaintiff, when his agents, the auctioneers, represented it to be "*twenty-five casks of blue vitriol, sound and in good order,*" warranted it to be so.

*Second.* That the representations so made were false and fraudulent.

After the evidence was all in, his honor the judge directed the jury to find a verdict for the plaintiff for the amount claimed, subject to the opinion of the court at general term.

The defendants requested his honor to submit the questions to the jury—

*First.* Whether or not the plaintiff, when he represented this article to be "blue vitrol, sound and in good order," intended to warrant it to be so.

*Second.* Whether or not the plaintiff, when he made this representation, knew that it was not true.

*Third.* To submit the whole case to the jury upon all the questions in it.

The court refused each of such requests, and the defendants excepted.

R. S. EMMETT, *for plaintiff.*
IRA D. WARREN, *for defendants.*

1. The court erred in not submitting the question to the jury, whether or not, when the plaintiffs represented this to be twenty-five casks of blue vitriol, sound and in good order, he intended to warrant it.

No particular form of words is essential to constitute a warrant of quality. Any assertion of the vendor, if relied upon by the vendee and understood by both parties as an absolute assertion, amounts to a warranty, and should be enforced as such (*Sweet* agt. *Bradly*, 24 *Barb.* 549; *Roberts* agt. *Morgan*, 2 *Cow.* 438; *Wilbur* agt. *Cartright*, 44 *Barb.* 536.)

Hawkins agt. Pemberton.

The question, whether the words used were understood and intended by the parties as a warranty, is a question of fact for the jury, and should be left to them to determine. (*Duffee* agt. *Mason*, 8 *Cowen*, 25; *Whitney* agt. *Sutton*, 10 *Wendell*, 412; *Cook* agt. *Moseley*, 13 *Wend.* 277; *Stryker* agt. *Bergen*, 15 *Wend.* 490; *Rogers* agt. *Ackerman*, 22 *Barb.* 134; *Blakeman* agt. *Mackay*, 1 *Hilt.* 266.)

II. The words used did amount in law to a warranty, and had the question been left to the jury, and they had found it to be a warranty, their finding would have been sustained.

In *Cook* agt. *Mosley* (13 *Wend.* 277), the seller said: "The mare is not lame, and I should not be afraid to warrant her." Held a warranty.

*Carley* agt. *Wilkins* (6 *Barb.* 557), the seller said: "The flour is superfine, and worth a shilling a barrel more than common." Held a warranty of quality.

*Holman* agt. *Dord* (12 *Barb.* 336), the seller said: "They are French goods, new, and in good order." Held a warranty.

*Blakeman* agt. *Mackey* (1 *Hilt.* 266), the seller said of oysters: "They are good, and in good order." Held a warranty.

A general warranty of *soundness* covers every defect, unless they are such as could be discerned by an ordinary observer without *particular skill.* (*Birdseye* agt. *Frost*, 34 *Barb.* 367.)

The parties in this case represented the vitriol to be "*sound and in good order*," while it had a latent defect which destroys it on being exposed to the air for twelve hours, and which no human skill can detect, without a chemical analysis, until it had been so exposed to the air. It was sold at auction, with no opportunity for a chemical analysis, and he now seeks to exonerate himself from liability in any way. If that can be done, it would be so repugnant to the feeblest sense of common justice as to require all former rules of law to be at once overturned and a rule established more consonant with the common sense of the commercial world. But we submit that the doctrine claimed by the plaintiffs cannot be sustained on principle nor authority.

III. We submit that the court erred in not directing a verdict for the defendants, or at least in not submitting the question of fraud to the jury; for fraud is to be made out from circumstances.

There is evidence that the plaintiff knew the character of the thing he sold.

The casks were only opened and exposed to the atmosphere about an hour before the sale.

He bought it at three and a half cents per pound, currency, while merchantable blue vitriol at the same time was worth eight and a half to nine cents per pound. This fact alone raises a presumption that he knew the character of the article.

The court of appeals say: "If the price paid is entirely below that of a sound article, a presumption would arise that the purchaser was apprised of the defect.', (*Hoe* agt. *Sanborn*, 21 *N. Y.* 566. *See opinion.*)

Therefore, we say upon those two facts we were entitled to go to the jury upon the question whether or not the plaintiff knew the character of the article he was selling.

It was not necessary, however. to show that the plaintiff knew its character, to establish fraud. "One who, without knowledge of its truth or falsity, makes a material representation, is guilty of fraud as much as if he knew it to be untrue, and that even if the fraud is committed by plaintiff's agent." (*Bennett* agt. *Judson*, 21 *N. Y.* 238.)

Applying this rule to the case at bar, the defendants were entitled to a verdict.

There is no dispute about the fact that the representation that the vitriol was "sound and in good order" was false. It was not "sound and in good order"

when it contained a latent defect that would develop itself by twelve hours exposure to the atmosphere, so as to render it worthless. We say, therefore, that the defendants were entitled to a verdict on this ground.

IV. A clear distinction is to be found between this and all the cases cited by the plaintiff. The court will observe that in none of those cases was a word said about the soundness or condition of the article sold.

It was simply selling an article which had no latent defects about it, but which was just what it appeared to be, viz., an inferior stone for a *bezoar* stone, *kelp* for *barilla,* &c. The court simply decided that there was no implied warranty from the name under which it was sold.

We apprehend the decision would have been different in those cases, if the seller had said at an auction sale, here is a quantity of barilla, "*sound and in good order,*" and it had proved to have been three-quarters *kelp* and one-quarter *barilla,* so prepared that no human skill could detect it by examination, or in any manner, except by chemical analysis, or by exposure to the atmosphere for several hours, when it would work its own destruction.

Therefore, we say that that class of cases has no application to the facts of this case, in any aspect of it.

In those cases, had there been any evidence, however feeble, to go to the jury, that the defendant knew that his statement in regard to the article he was selling was false, the court would have submitted the question of fraud to the jury.

V. The court should order a new trial, or render judgment for the defendants, with costs.

ROBERTSON, Ch. J. The merchandise which is the subject of controversy in this case was, according to the testimony of a chemist (Pohli), examined on the trial, a chemical compound, either of sulphuric acid, with three metals (*copper, iron* and *zinc*) and two earths (*alumina* and *lime*), in various proportions, or of salts composed of sulphuric acids and those metals and earths, in the form of sulphates. It appears to have been homogenous throughout, and was sold in its natural state, as manufactured, without any disguise or adulteration. It was known as *Saltzberger* vitriol, in Germany, where it was manufactured, and as *mixed vitriol* in this country, among chemists. It does not appear to have had any specific commercial designation here, except as being some kind of vitriol, a name which is common to all the salts formed by the union of sulphuric acid with copper, iron or zinc, which are only distinguished by the names of their color. That term, "*vitriol,*" being derived from the Latin (*vitrum*), expressive of its hardness and crystaline form, was first applied to the proto-sulphate of iron, from which "oil

of vitriol," or *sulphuric acid*, was probably first obtained. (*Ure's Dict. Chem. and Min.*) But strange to say, after being distinguished from *blue* vitriol, or sulphate of copper, by the term *green*, it was still sometimes called *copperas* or sulphate of copper (*Dana's Dict. of Min.*); and *copperas* was even appropriated to it in chemistry and mineralogy (*Ure's Dict. in Verb.*), although it is also used to designate both the real sulphate of copper and sulphate of zinc. (*Long's Pen. Cycl. in Verb.*) And as its principal use was in tanning, dyeing and other manufactures, or making Prussian blue or ink (*Dana Dict. of Min.*), and blue vitriol or sulphate of copper was similarly used, those who dealt in them were probably not very careful to distinguish the two kinds, except as to their quality. The article in question sold was actually of a blue color. One of the defendants (*Pemberton*), on his cross-examination, testified that there were different qualities and grades of *blue vitriol*, and that the amount of impurity constituted the difference in quality. Sulphate of copper, with a *stight* admixture of sulphate of iron, would commercially be called *blue vitriol*. One of the samples. of that sold to him he said he would call *blue vitriol, with a mixture*. This merchandise was termed in the invoice "blue vitriol, second quality," and in the bill of lading, sulphate of copper.

The article sold was therefore vitriol generally of a blue color, although of inferior quality, which, with the confusion of designations *for* it or *of* its component elements, fully justified the auctioneer (as agent of the plaintiff), in speaking of it, with the casks open for examination, as *blue vitriol*. He certainly would have been equally wrong in calling it *green*, or even *copperas*, which is sometimes applied to both kinds of sulphates indiscriminately, as has been shown. It would have been very difficult, even on a warranty that it was *blue vitriol*, to have established, from the testimony before us, that it was not. Its grade was a different thing. It was not adulterated sulphate of copper, any more than it

was either adulterated or improved sulphate of iron. Such adulteration could not change its name. (*Holden* agt. *Dakin*, 4 *J. R.* 421.) It was apparently a homogenous substance, composed of various elements into which it could be resolved, not a mere conglomerate. It did not in fact appear whether the chemists who analyzed it obtained the quantities of salts of which a metal was the basis separately in a normal condition, or whether they merely discovered such an amount of the different metals as, with the sulphuric acid contained in the composition, would form those qualities of those salts

There was, therefore, no artifice or disguise used to conceal the real character of the article sold from the defendants, nor any imposition practiced. The casks were open a sufficient time to permit its being handled and occularly inspected. One of the witnesses for the plaintiff (Webster) found it a mixed lot, some being of a greenish tinge, but "*it looked like merchantable blue vitriol.*"

There was evidence that went to show that the presence of iron could be detected by inspection, by the greenish shade it imparted.

There was no evidence in the case that the plaintiff knew the article sold to be anything else than it appeared to be, or that it was not pure unmixed sulphate of copper; for I cannot regard the mere smallness of price to be such.

The defendants did not produce as a witness the person, if there was one, upon the faith of whose information they swore in their answer that the substance "was mixed and put up by the plaintiff, or some person to him known, for the purpose of cheating and defrauding the purchasers thereof." If there was no such person, they are responsible to their consciences, at least, for having so sworn. Suffice it to say there was no evidence of fraud, and no request was made to submit the question, if there had been any, to the jury.

It is hardly necessary, at this late day, to discuss the question whether the vendor of an article, present and exposed to the examination of purchasers at the time of its sale, is

Hawkins agt. Pemberton.

liable for their applying a wrong name to it or giving a false description of it, or even doing so in a bill of parcels afterwards, where there is neither fraud nor warranty in the sale. Every case decided in this state, from *Seixas* agt. *Woods* (2.1 *Caines*, 48), where peachum was sold as *brazeletto* wood, and *Sweet* agt. *Colgate* (20 *J. R.* 196), where *kelp* was sold for *barilla*, down to the latest, has sustained the doctrine of · *caveat emptor* in such a case. (*See cases collected in* 4 *Abb.* *Dig. Sales*, § 70.)

The affirmation made at the sale, in this case, that the article was "sound and in good order," even if it were a warranty, was true. The only defect found was a supposed dampness, which was not proved to be unsoundness. And one witness (Webster) testified that the casks were "*in good order.*" The term "*sound*" applies to *condition* only, not quality or kind, and is opposed to *defective, decaying* or *injured.* The liability of such compound to effloresce, when exposed to the air, was not a *defect,* because it was a natural quality of the sulphate of iron, which was one of its elements. The article in question was evidently sound as *inferior blue vitriol.* If those had been the words used, there could have been no pretext for a defense; and yet the plaintiff was not bound to add the quality of the article, to prevent his being bound by a warranty that it was the best. It was *blue vitriol,* even if it was of an inferior quality. Whether an assertion is a warranty, when all the facts are admitted, is a question of law for the court, not for the jury. Every positive assertion as to the qualities or character of an article, made in the course of a negotiation for the sale of it, except as to value or condition, capable of being discovered by inspection, intended and adopted to induce the buyer to purchase, is a warranty. If plainly so adopted, taken by itself, it must be shown to have been accompanied by some qualifying words or acts, showing it to be a mere expression of opinion, in order to prevent its being a warranty. The question of intent, when doubtful, in such cases, is the only

one for the jury, upon all the facts. In the three cases cited by the defendants' counsel (*Cook* agt. *Mosely*, 13 *Wend.* 277; *Carley* agt. *Wilkins*, 6 *Barb.* 557; *Holman* agt. *Dord*, 12 *Barb.* 336), the court held as matter of law that the character of the assertion showed it to be a warranty, and intended as such.

There was no dispute about the facts in this case. The article sold was called by the auctioneer "*blue vitriol*," but evidently was so termed as being its commercial designation, or as being vitriol of a blue color (which it was). In either case there was no warranty of anything.

There having been no question to submit to the jury under the evidence, and no error committed in the admission of evidence complained of, judgment must be given for the plaintiff for the amount of the verdict, with the costs of the action and the hearing.